[Cite as *Underwood v. Cuyahoga Community College*, 2023-Ohio-4180.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

| | |
|---|---|
| MICHAEL UNDERWOOD, | CASE NO. 2023-G-0012 |
| Plaintiff-Appellant, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| CUYAHOGA COMMUNITY COLLEGE, | Trial Court No. 2021 M 000227 |
| Defendant-Appellee. | |

## O P I N I O N

Decided: November 20, 2023
Judgment: Affirmed

*Donald Gallick*, 190 North Union Street, Suite 102, Akron, OH 44304 (For Plaintiff-Appellant).

*John N. Childs*, *Victoria L. Ferrise*, and *Monica B. Andress*, Brennan, Manna & Diamond, LLC, 75 East Market Street, Akron, OH 44308 (For Defendant-Appellee).

MARY JANE TRAPP, J.

{¶1} Appellant, Michael Underwood ("Mr. Underwood"), appeals from the judgment of the Geauga County Court of Common Pleas that awarded summary judgment in favor of appellee, Cuyahoga Community College ("Tri-C"), on his claims of wrongful termination, breach of contract, and compensation for unused benefits.

{¶2} Mr. Underwood raises three assignments of error on appeal, contending the trial court erred in awarding summary judgment in favor of Tri-C because (1) he asserted a valid claim of wrongful termination in violation of public policy pursuant to *Greeley v.*

*Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990); (2) Tri-C breached his employment contract for an improper motive; thus, the trial court erred in finding in favor of Tri-C on his *Greeley* claim; and (3) it failed to consider his "contra" affidavit and depositions filed in opposition to summary judgment when it decided he received full compensation for unused vacation and sick time.

{¶3} After a careful review of the record and pertinent law, we find Mr. Underwood's assignments of error to be without merit.

{¶4} Firstly, a review of the trial court's judgment entry reveals it erroneously found Mr. Underwood was an employee-at-will. The court seemingly misread the letter of appointment ("LOA") since, per its terms, only the employee could terminate the appointment at "any time, for any reason" with written notice fourteen days in advance. Tri-C, however, could only terminate the appointment "at any time *as part of a disciplinary action, reduction in force, or otherwise in accordance with College policies, procedures, or other rules or standard practices.*" (Emphasis added.) Further, the LOA was for a fixed term (one-year) of employment. Because Mr. Underwood was not an at-will employee, he cannot bring a common law claim of wrongful termination in violation of public policy. Thus, we affirm the trial court's judgment awarding Tri-C summary judgment on this claim because it reached the right conclusion albeit for erroneous reasons.

{¶5} Secondly, we construe Mr. Underwood's second assignment of error to mean that if we find he was not an employee-at-will (and affirm the lack of merit of his *Greeley* claim), we should remand for the trial court to consider the evidence he submitted on summary judgment on his breach of contract claim alleging he was terminated for an improper motive. Similarly, in his third assignment of error, he contends the trial court

2

failed to consider the evidence he submitted proving he was not compensated for unused benefits. A review of the trial court's lengthy judgment entry, however, reveals the court reviewed the evidence he submitted and found he failed to submit any evidence in rebuttal that raised genuine issues of material fact that he was not terminated for cause and that he was not paid all compensation due on his accumulated benefits. Quite simply, as the nonmoving party in a summary judgment exercise, Mr. Underwood failed to meet his reciprocal burden to submit evidentiary quality material supporting his position.

{¶6} Thus, the judgment of the Geauga County Court of Common Pleas is affirmed.

### Substantive and Procedural History

{¶7} In April 2021, Mr. Underwood filed a complaint in the Geauga County Court of Common Pleas, alleging (1) Tri-C breached his employment contract by acting in bad faith and investigating him for a legal, ethical personal loan from a Tri-C contractor in 2012; (2) wrongful termination in violation of public policy because he reported potential illegal activity; and (3) compensation for unpaid benefits, i.e., unused sick and vacation time.

### Tri-C's Motion for Summary Judgment

{¶8} Relevant to this appeal, Tri-C filed an "amended motion for summary judgment to include exhibits" in January 2023. Tri-C argued Mr. Underwood (1) could not maintain a breach of contract claim because he was an employee-at-will; (2) failed to allege the clarity and jeopardy elements of his wrongful termination *Greeley* claim; and (3) received his full compensation, including vacation and sick leave benefits, in his last paycheck.

3

Case No. 2023-G-0012

### *Employee-at-will*

{¶9}  Firstly, Tri-C argued Mr. Underwood was an employee-at-will because either party could terminate Mr. Underwood's employment "for any reason" pursuant to the LOA.

{¶10}  Tri-C alleged that Mr. Underwood was initially hired around January 2004 as manager of plant operations pursuant to an annual LOA.  From 2004 until 2019, Mr. Underwood's employment was renewed by an annual LOA.  In 2020, Mr. Underwood's employment was terminated for cause pursuant to the LOA.

{¶11}  Attached to Tri-C's motion for summary judgment was an affidavit from a Tri-C patrolman and former Tri-C detective, Jamie Bailey ("Ptlm. Bailey"), with an attached copy of the final LOA.  A review of the LOA reveals it provided the term of employment (July 1, 2019, through June 30, 2020), Mr. Underwood's compensation, and his job requirements, i.e., he "shall diligently and satisfactorily perform the duties of manager of facilities during this time period, as well as such duties that may be assigned by the College from time-to-time"; and he "is subject to the policies, procedures, and other applicable rules of the College, as amended from time-to-time."

{¶12}  Regarding termination of employment, the LOA provided that the "College may terminate this assignment at any time as part of a disciplinary action, reduction in force, or otherwise in accordance with College policies, procedures, or other rules or standard practices.  Employee may terminate this assignment, for any reason or no reason at all, by providing not less than fourteen days advance written notice to employee's immediate supervisor."

4

**{¶13}** Further, "[n]either the College nor the Employee shall be obligated to renew this assignment or enter into any other assignment after this date. Employee understands and acknowledges that there is no expectation of employment after assignment ends."

### *Mr. Underwood's Paid Administrative Leave, Investigation, and Termination*

**{¶14}** Tri-C further alleged Mr. Underwood was terminated for cause "pursuant to the LOA" due to violations of college policy and procedure.

**{¶15}** Attached to Tri-C's motion for summary judgment was an affidavit from Ami Hollis ("Ms. Hollis"), the executive director of Tri-C's human resources information system and total rewards program. Ms. Hollis averred in her affidavit that on April 1, 2020, Tri-C issued a paid administrative leave notice to Mr. Underwood, advising him that Tri-C was initiating an investigation of alleged violations of college policy and procedures. The letter, attached to Ms. Hollis' affidavit, further provided Mr. Underwood would remain on paid status, his benefit accruals would not be affected, and his placement on paid administrative leave was "not a disciplinary measure." However, "[b]ased on the outcome of that investigation, disciplinary measures may be imposed at some future date and may be applied retroactively to this paid administrative leave." The letter also informed Mr. Underwood he should "refrain from accessing your Tri-C emails or other desktop computer activities" and refrain from contacting other Tri-C employees or contractors regarding the investigation.

**{¶16}** The investigation was prompted by one of Mr. Underwood's employees, Russell Paintiff ("Mr. Paintiff"), a plant operations specialist, who filed a whistleblower complaint against Mr. Underwood. In his letter (attached to Ptlm. Bailey's affidavit), Mr. Paintiff detailed several instances of "inappropriate and fraudulent behavior," including a

5

Case No. 2023-G-0012

$50,000 personal loan to Mr. Underwood and his wife and the installation of kitchen cabinetry in Mr. Underwood's private residence in the U.S. Virgin Islands.

{¶17} Ptlm. Bailey described Tri-C's investigation in his affidavit. The investigation confirmed Mr. Underwood had been involved in several personal deals with various third-party Tri-C vendors, including a contractor who installed kitchen cabinetry in Mr. Underwood's U.S. Virgin Island vacation home and a $50,000 personal loan from a painting contractor, Keith Donaldson ("Mr. Donaldson") to Mr. Underwood and his wife's real estate title company for the Underwoods' purchase of a property in Chagrin Falls, Ohio.

{¶18} In Mr. Donaldson's affidavit, he averred that his company started providing services for Tri-C in 2009 and that Mr. Underwood was the primary Tri-C representative through which he conducted business. Around 2012, he gave Mr. Underwood and his wife an interest-free personal loan (paid to the title company). During the two years Mr. Underwood was repaying the loan, his company continued to provide services for Tri-C. At the end of the repayment period, Mr. Underwood ceased contracting with Mr. Donaldson's company on behalf of Tri-C. Attached to Mr. Donaldson's affidavit were a fiduciary deed, a mortgage lien on behalf of Mr. Donaldson and his wife, a chart of the payments Mr. Underwood made to Mr. Donaldson, copies of the checks from Mr. Underwood and Mr. Donaldson's corresponding deposits, and the satisfaction of Mr. Underwood's mortgage.

{¶19} In October 2020, Ptlm. Bailey referred the matter to the Cuyahoga County Prosecutor's Office for review and consideration. In November 2020, an assistant prosecutor from that office advised him by email that Mr. Underwood's actions constituted

6

misdemeanors, including soliciting improper compensation pursuant to R.C. 2921.43 and violating ethics laws pursuant to R.C. 102.03(D)-(E). In December 2020, Tri-C referred the matter to the City of Cleveland Prosecutor's Office for review and consideration. In March 2021, an assistant prosecutor from that office advised Ptlm. Bailey via email that the office was declining to issue criminal charges since the statute of limitations for those crimes had run. The emails were included in the incident report conducted by Tri-C and attached to Ptlm. Bailey's affidavit.

{¶20} Ms. Hollis attested that at the end of the investigation, on June 12, 2020, the office of Human Resources sent Mr. Underwood a notice of termination. The notice, which was also attached to Ms. Hollis' affidavit, informed Mr. Underwood that he was terminated because he "violated the Ohio Ethics Laws and the College's Employee Code of Conduct Policy 3354:1-43.02" by accepting a loan from a vendor of the college. The notice further stated there was evidence that he solicited a former contractor to do work for him personally, which was in "direct violation of the Ohio Ethics Laws and the College's Employee Code of Conduct Policy."

### Compensation for Unused Benefits

{¶21} Secondly, Tri-C argued that Mr. Underwood received full compensation for his unused benefits in his last paycheck.

{¶22} Ms. Hollis further averred that while the investigation was pending and Mr. Underwood was on paid leave, he received a notice from Tri-C informing him of the 2020 Voluntary Separation Program ("VSP"). A review of the VSP notice and VSP plan documents attached to Ms. Hollis' affidavit reveals employees terminated for cause between June 1, 2020, and July 15, 2020, were not eligible for the program. "Cause" was

7

defined as "a material violation by the Eligible Employee of any law, rule, regulation, constitutional provision, policy, procedure, or by-law of the College, or local, state, or federal law, which reflects adversely upon the College."

**{¶23}** Ms. Hollis further averred that even though Mr. Underwood was not eligible for the VSP program, he had been fully compensated for his unused vacation and sick leave in his final paycheck. Attached to her affidavit were several documents evidencing the payout, including Tri-C's payout policies for vacation and sick time and a check detail inquiry of Mr. Underwood's final paycheck. These reflected Mr. Underwood was eligible to receive up to 30 days of vacation and sick time payout upon his termination. According to his final paycheck, Mr. Underwood received compensation for 225 hours of vacation time ($11,195.54) and 225 hours of sick leave ($11,195.64).

### Mr. Underwood's *Greeley Claim*

**{¶24}** Thirdly, Tri-C argued Mr. Underwood failed to establish a common law employee-at-will wrongful termination claim pursuant to *Greeley*. Tri-C argued Mr. Underwood failed to establish it violated a public policy by terminating Mr. Underwood (the clarity element) and that the purpose of the proposed public policy would be compromised if the court did not allow Mr. Underwood to proceed with his claim (the jeopardy element).

**{¶25}** In 2017, Mr. Underwood reported to campus police that his colleague, Russell Paintiff ("Mr. Paintiff"), was stealing from Tri-C's scrap metal recycling program.

**{¶26}** Ptlm. Baily averred that he was advised by Lieutenant Ronald Wynne ("Lt. Wynne") in the fall of 2018 to follow up with Mr. Underwood regarding his verbal allegation that Mr. Paintiff was stealing from the scrap metal recycling program. Mr. Underwood

8

never scheduled a meeting to formally discuss his allegations against Mr. Paintiff, nor did he follow the appropriate protocols to open a formal investigation by campus police, as instructed by Lt. Wynne. On October 2, 2018, Ptlm. Bailey received an email (attached to his affidavit) from Mr. Underwood stating: "It appears that everything is in order and all scrap is being accounted for." No further action was taken by campus police.

### Mr. Underwood's Brief in Opposition To Summary Judgment

{¶27} Mr. Underwood filed a brief in opposition. He also filed his deposition transcript and those of David November ("Mr. November"), a sustainability manager for Tri-C, as well as Tri-C employees under his supervision: Benjamin Adams ("Mr. Adams"), a maintenance mechanic; George Lohri ("Mr. Lohri"), a mechanic and electrician; and Mr. Paintiff, who was in charge of plant operations for Tri-C.

{¶28} Mr. Underwood argued that he established a valid *Greeley* claim because Tri-C has a "public interest to investigate potential theft of taxpayer property and funds" and "financial mismanagement." His allegation that Mr. Paintiff was thieving from the scrap metal recycling program was a good-faith complaint that Tri-C failed to investigate. As evidence, he cited the depositions of Mr. Adams, Mr. Lohri, and Mr. November, in which all three stated no one from Tri-C asked them any questions of possible crimes and they were unaware of any problems with the recycling program. As further evidence of theft, Mr. Underwood pointed to the deposition of Mr. Adams, in which he stated he would often take scrap metal for recycling but was never required to write down any dollar amounts or record any figures. Similarly, Mr. Lohri testified Mr. Paintiff would decide which scrap yards to use.

9

Case No. 2023-G-0012

**{¶29}** Mr. Underwood further argued that evidence of theft from the scrap metal recycling program exists, but Tri-C refused to acknowledge it. As evidence, Mr. Underwood gathered all the records he had. He was unsure if he obtained the records from discovery or if he already had them. He added up the scrap metal receipts and compared them to the copies of the checks received by Tri-C, finding an approximate $10,000 discrepancy.

**{¶30}** Mr. Underwood claims that instead of investigating his complaint against Mr. Paintiff, Tri-C terminated him. Further, no ethics violation claim was levied against Mr. Paintiff, even though he admitted in his deposition that he performed some free personal work on the home furnace of Tri-C's police chief.

**{¶31}** Mr. Underwood also argued he was offered a severance package for "retirement," which included $59,710.12, two years of tuition remission, and 82% of the premium for six months of COBRA payments (the VSP program). The fact that he was ineligible for the VSP program was further evidence of malice and/or retaliation for his repeated questions regarding possible theft and missing records from the scrap recycling program.

**{¶32}** Attached to Mr. Underwood's deposition was a chart, which he presumably made himself, listing various scrap metal recyclers with dates, receipts of recycled scrap, and whether a check was deposited. He also attached the VSP notice and the administrative leave notice. Attached to Mr. November's deposition were receipts from one scrap metal recycler, A&B Metal Recycling. Attached to Mr. Paintiff's deposition were receipts and checks from various scrap metal recyclers and a portion of Tri-C's investigation of Mr. Underwood.

10

## The Trial Court's Ruling in Favor of Tri-C

{¶33} The trial court reviewed that Mr. Underwood was, in essence, claiming he was terminated because he complained his subordinate, Mr. Paintiff, was stealing scrap.

{¶34} The court reviewed the testimony from Mr. Lohri and Mr. Adams, noting it revealed Mr. Paintiff started Tri-C's scrap recycling program. Scrap was taken on an irregular basis whenever it was sufficiently accumulated. A check would be issued by the scrap yard based on the weight of the recycled items. The checks were not for significant sums of money and there was never any concern about where the checks were going.

{¶35} The court also reviewed the testimony of Mr. November, who reports quarterly on diversion rates from landfills and collects the weights of Tri-C's recycled scrap metal from the plant managers. He has nothing to do with the checks received from the recycling companies. At one point, Mr. Underwood told him he was unsure why some tickets were missing. Not long after his conversation with Mr. Underwood, the tickets were found. Mr. November stated, "it wasn't something that seemed like a big deal to me."

{¶36} The court's review of Mr. Paintiff's testimony revealed he gave all the tickets to Mr. Underwood, who was in charge of responding to Mr. November's quarterly inquiry. Mr. Paintiff testified Mr. Underwood "didn't care about nothing just as long as he didn't hear about it." He described Mr. Underwood as a "bad boss" and "very dishonest."

{¶37} Beginning in 2009 or 2010, Mr. Paintiff started complaining about Mr. Underwood to Blair Bosworth ("Mr. Bosworth"), Mr. Underwood's boss; Judi McMullen, the vice president of human resources; and David Kuntz, executive vice president. He eventually spoke to Tri-C's general counsel and the Tri-C police. On March 27, 2020, he

filed a written "Whistleblower Complaint." Mr. Paintiff did not know Mr. Underwood was questioning or accusing him of stealing until around the time Mr. Underwood was terminated.

{¶38} Mr. Underwood's testimony revealed he was hired pursuant to a series of annual renewable LOAs, and he had no document providing him with employment beyond June 30, 2020. Mr. Underwood suspected theft when he received emails from Mr. November asking plant managers for receipts from scrap recycling. Mr. Underwood did not investigate but did ask Mr. Paintiff about a recycler's check. There were several times Mr. Underwood did not receive a check from Mr. Paintiff. When Mr. Underwood verbally reported this to the Tri-C police, he was directed to write a report and submit it to Ptlm. Bailey. Instead, he sent an email to Ptlm. Bailey, stating that everything was in order and all the scrap was being accounted for. He never put together the report, he withdrew his allegations, and he made no further ones.

{¶39} When Mr. Underwood reported his complaints to Mr. Bosworth, he felt Mr. Bosworth was "dismissive, condescending, and didn't feel Mr. Underwood was doing a good job." Mr. Underwood believed Mr. Paintiff's allegations were meritless, and he was retaliating against Mr. Underwood.

### Breach of Contract Claim

{¶40} On Mr. Underwood's breach of contract claim, the trial court found either Tri-C or Mr. Underwood could terminate the employee relationship and Mr. Underwood was an employee-at-will. The trial court further found the LOA provided that "Tri-C had the right to terminate Mr. Underwood's employment for 'any reason or no reason at all' by providing not less than fourteen days advance written notice." In addition, Tri-C had the

12

right to terminate Mr. Underwood's employment "any time as part of a disciplinary action, reduction in force, or otherwise."

{¶41} The trial court concluded Tri-C met its initial burden, using evidence in the record to show (1) the employment relationship was at will, (2) it provided more than fourteen days' advance written notice of termination, (3) it had the right to terminate the relationship without notice for disciplinary reasons, and (4) it paid Mr. Underwood all sums to which he was entitled.

{¶42} The trial court also found that Tri-C met its initial burden establishing Mr. Underwood was terminated for good cause because (1) its termination of Mr. Underwood was contractually permissible, (2) it had good cause to terminate Mr. Underwood's employment, and (3) it paid Mr. Underwood all sums due in his final paycheck.

{¶43} Further, Mr. Underwood failed to provide rebuttal evidence raising a genuine issue of material fact.

{¶44} Thus, Tri-C was entitled to summary judgment on Mr. Underwood's breach of contract claim.

### *Wrongful Termination in Violation of Public Policy*

{¶45} The trial court found Mr. Underwood failed to establish the first element of a *Greeley* claim—a clear public policy (the clarity element). Tri-C showed that while Mr. Underwood cited various statutes, regulations, and other authorities, he failed to cite a public policy that protected him. He (1) was an employee who orally reported personal suspicions of potential illegal activity, (2) withdrew those allegations in 2018, (3) had his own annual employment contract renewed in 2019, and (4) was terminated in 2020 after an investigation into his own illegal activities. The court further found Mr. Underwood

13

failed to provide rebuttal evidence showing the existence of a clear public policy that supported a *Greeley* claim.

{¶46} In addition, the trial court found Mr. Underwood failed to establish the second element of a *Greeley* claim—jeopardy. Tri-C met its initial burden by showing Mr. Underwood cannot satisfy this element because society's interest is adequately protected by significant civil, criminal, and administrative remedies for fraud and theft.

{¶47} Thus, the trial court awarded summary judgment in favor of Tri-C on Mr. Underwood's claim of wrongful termination in violation of public policy.

### *Compensation Claim*

{¶48} Lastly, the trial court found Mr. Underwood failed to establish he was not fully compensated for unpaid benefits. Tri-C submitted evidence that showed (1) Mr. Underwood received full compensation under his agreement with Tri-C for unused vacation and sick leave in his final paycheck, (2) Mr. Underwood was ineligible for the VSP program, and (3) Tri-C had paid Mr. Underwood all benefits he was due. Mr. Underwood failed to offer any evidence in rebuttal to raise a genuine issue of material fact that he was not paid all benefits due.

{¶49} In conclusion, the trial court granted summary judgment in favor of Tri-C on Mr. Underwood's claims.

{¶50} Mr. Underwood raises three assignments of error on appeal:

{¶51} "[1.] The trial court erred by granting summary judgment on the wrongful termination claim because the ruling ignored the public policy interest in protecting employees who report theft of taxpayer money; stealing from the taxpayers is against the

14

public policy of the state of Ohio, even if reported by a citizen instead of a law enforcement officer.

**{¶52}** "[2.] The trial court erred in granting summary judgment on count II of the complaint because Tri-C breached Underwood's employment contract for an improper motive.

**{¶53}** "[3.] The trial court erred in granting summary judgment by finding appellant received 'full compensation' for unused vacation and sick time because the final judgment failed to consider a letter detailing unpaid compensation, failed to consider appellant's contra affidavit and failed to consider any of the filed depositions."

### Summary Judgment

**{¶54}** We review de novo a trial court's order granting summary judgment. *Sabo v. Zimmerman*, 11th Dist. Ashtabula No. 2012-A-0005, 2012-Ohio-4763, ¶ 9. A reviewing court will apply the same standard a trial court is required to apply, which is to determine whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Id.*

**{¶55}** "Since summary judgment denies the party his or her 'day in court' it is not to be viewed lightly as docket control or as a 'little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In *Dresher v. Burt*[, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996)], the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must be in the record or

15

the motion cannot succeed. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." *Welch v. Ziccarelli*, 11th Dist. Lake No. 2006-L-229, 2007-Ohio-4374, ¶ 40.

**{¶56}** "If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112[, 526 N.E.2d 798]." *Ziccarelli* at ¶ 40.

### *Greeley* Claim

**{¶57}** In Mr. Underwood's first assignment of error, he contends the trial court erred in finding that he failed to identify a clear public policy on his wrongful termination *Greeley* claim.

**{¶58}** We must first address whether the trial court properly determined Mr. Underwood was an employee-at-will.

**{¶59}** Under Ohio law, an employment relationship with no fixed duration is deemed to be at-will employment. *Snedigar v. Miami Univ.*, 10th Dist. Franklin No. 11AP-8, 2011-Ohio-4365, ¶ 10. The identifying characteristic of an employee-at-will is that

16

Case No. 2023-G-0012

either the employer or the employee can terminate employment for any reason which is not contrary to law. *Haynes v. Zoological Soc. of Cincinnati*, 73 Ohio St.3d 254, 258, 652 N.E.2d 948 (1995).

{¶60} As our review of the LOA reveals, the LOA was for a fixed duration—a specified one-year term. Mr. Underwood, as an employee, could "terminate for any reason or no reason at all, by providing not less than fourteen days advance written notice to the immediate supervisor." Tri-C, however, could only terminate the appointment "at any time *as part of a disciplinary action, reduction in force, or otherwise in accordance with College policies, procedures, or other rules or standard practices.*" (Emphasis added.) The trial court erred in finding that pursuant to the LOA, "Tri-C had the right to terminate Mr. Underwood's employment for 'any reason or no reason at all' by providing fourteen days of advance written notice." A plain reading of the LOA reveals no such provision exists.

{¶61} Thus, per the terms of the LOA, Mr. Underwood was not an employee-at-will but was hired under a series of non-renewable, fixed duration employment contracts. These non-renewable, one-year letters of appointment have been found to be contracts. *See Stevenson v. Cuyahoga Cty. Community College*, 8th Dist. Cuyahoga No. 81637, 2003-Ohio-2191, ¶ 2 (the appellant had been employed at Tri-C from 1991 until July of 2000 through a series of non-renewable, one-year contracts); *Gaetano v. Bd. of Trustees of Cuyahoga Community College*, 8th Dist. Cuyahoga No. 41520, 1980 WL 355092, *1 (June 26, 1980) (the appellee had been employed by Tri-C since 1968 under a series of one-year contracts).

17

{¶62} A *Greeley* claim only applies to employees at will. As the *Greeley* court explained, "[p]ublic policy warrants an exception to the *employment-at-will* doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Id.* at paragraph one of the syllabus. *See also Haynes* at 257 (appellant was a member of a union and not an employee-at-will; thus, she could not bring a *Greeley* claim).

{¶63} Thus, we affirm the trial court's award of summary judgment on Mr. Underwood's claim of wrongful termination in violation of public policy since it reached the right conclusion, albeit for erroneous reasons. "It is the duty of the reviewing court to affirm the judgment if it can be supported on any theory, although a different theory from that of the trial court." *Newcomb v. Dredge*, 105 Ohio App. 417, 424, 152 N.E.2d 801 (2d Dist.1957). "This is so because reviewing courts affirm and reverse judgments, not the reasons for the judgments." *Geneva v. Fende*, 11th Dist. Ashtabula No. 2009-A-0023, 2009-Ohio-6380, ¶ 33. "Thus, when a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial." *State v. Payton*, 124 Ohio App.3d 552, 557, 706 N.E.2d 842 (12th Dist.1997). *See also State ex rel. Duncan v. Driscoll*, Slip Opinion No. 2023-Ohio-3113, ¶ 11 ("[T]his court will not reverse a correct judgment merely because erroneous reasons were given for it."); *Bloom v. Cent. Natl. Bank of Cleveland*, 11th Dist. Geauga No. 630, 1975 WL 180976, *2 (Aug. 11, 1975).

{¶64} Mr. Underwood's first assignment of error is without merit.

Case No. 2023-G-0012

**Breach of Contract and Unpaid Compensation Claims**

{¶65} We address Mr. Underwood's second and third assignments of error together since they fail for the same reason. We construe Mr. Underwood's second assignment of error to mean that if we find he was not an employee-at-will (and affirm the lack of merit of his *Greeley* claim), we should remand for the trial court to consider the evidence he submitted in support of his breach of contract claim on summary judgment since he was terminated for an improper motive. In Mr. Underwood's third assignment of error, he contends the trial court erred in awarding summary judgment in favor of Tri-C by finding he received "full compensation" for unused vacation and sick time because the trial court failed to consider his affidavit, depositions, and a letter detailing unpaid compensation (the VSP notice).

{¶66} It is clear from the court's comprehensive judgment entry that it reviewed Mr. Underwood's evidence submitted on summary judgment. Further, we agree with the trial court that he failed to introduce any evidentiary quality material in rebuttal that raised genuine issues of material fact on any of his claims.

{¶67} Mr. Underwood had a reciprocal burden to provide evidentiary quality material demonstrating a genuine issue of material fact exists. *Dresher*, *supra*, at 293; *Bressi v. Irwin*, 2021-Ohio-2550, 175 N.E.3d 979, ¶ 52 (11th Dist.). Thus, pursuant to Civ.R. 56(E), "[w]hen a motion for summary judgment is made *and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings*, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against

the party." (Emphasis added.) In other words, "[o]nce the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Slyman v. Piqua*, 494 F.Supp.2d 732, 734 (S.D.Ohio 2007), quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff.").

{¶68} Firstly, Mr. Underwood failed to provide any evidence that he was terminated in retaliation and/or for an improper motive for orally reporting his suspicions that Mr. Paintiff was thieving from the scrap metal recycling program. There is no evidence of theft. The fact that his employees were never asked about possible theft does not indicate Tri-C was negligent in failing to investigate the scrap metal recycling program, as Mr. Underwood contends. Rather, the evidence reflects that after making a verbal complaint to Tri-C police, Mr. Underwood was directed to provide them with a written report, which he failed to do. In fact, he withdrew his allegation via email to Ptlm. Bailey. The depositions of Mr. Underwood's employees further highlight that none of the employees ever suspected theft or any problems with the scrap metal recycling program. In addition, Mr. Underwood failed to submit evidentiary quality materials to raise a genuine issue of material fact that monies were missing from the recycling program. He testified he was not sure if he obtained the recycling receipts and checks from discovery or if they were from his personal records and further stated they were all the records he could

20

locate. He was not the keeper of these business records for Tri-C. He then compiled them into a worksheet, which he believed showed a discrepancy of approximately $10,000.

{¶69} Secondly, Mr. Underwood failed to submit any evidentiary quality materials to rebut the evidence offered by Tri-C that demonstrated he was terminated for cause and was in breach of the LOA. Tri-C submitted a comprehensive investigative report, including the specific statutes and ethics laws Mr. Underwood was found to have violated, the LOA, the administrative leave notice, and his termination letter.

{¶70} Thirdly, Mr. Underwood failed to provide any evidence in rebuttal that raises a genuine issue of material fact that he was eligible for the VSP program and that he was not compensated for his accumulated vacation and sick leave per Tri-C's policy of allowing employees to cash out up to 30 days of unused vacation days and sick leave.

{¶71} Mr. Underwood's second and third assignments of error are without merit.

{¶72} The judgment of the Geauga County Court of Common Pleas is affirmed.


EUGENE A. LUCCI, J.,

ROBERT J. PATTON, J.,

concur.